This is the matter of Peter Fan et al. v. Stonemore Partners L P et al. Mr. Goldsmith. Good morning, your honor. You may proceed. Good morning. May it please the court. My name is David Goldsmith. I represent the plaintiff, Mr. Fan, and his affiliated investment entities in this securities class action. I'd like to respectfully request three minutes for rebuttal. Granted. Thank you, sir. The complaint in this action, your honor, is against Stonemore, which is a publicly traded limited partnership which provides what they call death care goods and services, sufficiently pleads claims for securities fraud under the Exchange Act and the PSLRA. The opinion below, in which the district court dismissed the pleading on falsity, materiality, and scienter grounds, should be reversed and sent back. There are other named defendants besides Stonemore L P. You've named some individual defendants. Yes, Chief Judge, we have. And it might be helpful as you go forward because the case is all about statements, representations, alleged omissions, alleged misrepresentations. If you directed at least some of your argument to statements that have been made by the specific individuals. Oh, I certainly will, your honor. And I agree, your honor, that there certainly are issues here are directed to the individual defendants, particularly with regard to scienter issues and with imputation of scienter to the to the corporate entity, Stonemore L P. And an issue that will prefigure in this appeal also is the relationship between the Stonemore L P entity, which is the company, if you will, and also to Stonemore G P, if I can call it that, which is the general partner. And the operating partner. And the operating. This is this securities class action is a bit different than than the cases that have generally come before your honors in that this is not your typical Delaware corporation. But this company is a master limited partnership, which is a publicly traded, limited, limited partnership. So it is publicly traded. It's traded, as I recall, on on the New York Stock Exchange. So let me begin by by asking or confirming everyone agrees that we're talking about an efficient market here with a with an entity that's that's traded publicly on the New York exchange. Right. Is that a footnote that just sort of pins that down? Right. And you referred a few minutes ago to what the district court did here. You're the you're the appellant. One thing that struck me, at least superficially, is that there's a relatively short, relatively brief discussion as to specific Gallagher by the district court here. In response to a complaint that is comprised of two hundred and ninety two paragraphs. In fact, I read it in its entirety over the weekend. Canceled dinner plans at one point and but got through it all. Are you faulting the district court here for giving inadequate attention to some of the specific allegations that you've set for? Well, we are, your honor. I mean, we're we're we recognize this is under de novo review and we're prepared to argue about the case itself. But part of our contention this morning is that we believe that the district court's reasoning was respectfully inadequate and did not give you the reason the district court does not is not required to look at each at each and every one of the allegations or at least to discuss an opinion. No, I mean, the district court is not required to write it, write a phone book. But on on the center, for example, which I think is the most, you know, perhaps what your honor is getting at. You know, there is a one of the case that's very important for for this matter. Tell labs from Supreme Court in 2007 where the Supreme Court was very specific that the district court has to look at all of the center allegations holistically. So the court has to look at all the allegations together in a in a in a universal sense and consider each inference and allegation as they affect one another. You can't do this sort of, you know, segmented analysis. Why are the disclosures in the 10 case not sufficient? Coupled with the grass, the gap and non gap financials are contrasted with one another. Yeah, right. So thank you for that question, your honor. So well, so no, this is absolutely our entirely too polite. Yeah, no, it's something I fully intended to tackle. And it's what you're going to hear from my friend on the other side. So so this goes off the center track a little bit. And I'd like the opportunity to get back to it. But one one issue in the case is that you have you've got gap financials and non gap metrics next to each other. Those are not financials, your honor. Those are metrics because the non gap are metrics that the company is able to put together for themselves. They are committed. They disclosed all this in the 10 case. They disclosed their gap financials and certain non gap metrics. And the most important non gap metrics for this court to consider is a big line item called distributable cash flow. But they did disclose in the 10 case they would borrow money if they disclose they borrow money. But there's a lot that they don't disclose about that. I mean, the problem with the risk disclosures is that they don't connect the dots between the borrowing and the distribution. Well, let me stop you right there of putting aside the expression connecting the dots. You would agree, would you not, that a considerable number of the allegations you make in the complaint involve statements that surely you concede are literally true. Like the disclosures that Judge Restrepo just referred. So there are certain statements that you could, if you apply a very narrow approach, and I would suggest a crabbed approach, are literally true. But what is also clear, Isabel, in this area of the law, your honors, is that literally true doesn't get you away from liability. That's what I'm getting at. I mean, I'm not sure that I've yet heard you use the word, and maybe you have, misleading. Right. I mean, literally true is not good enough because it's not just whether something is false, but whether it misleads. And under the law in this circuit and every other circuit, a half truth is just as bad as no truth at all. Well, you're arguing certain omissions were made intentionally that would have to be included in order to make, in order to accurately disclose what they in fact said they were disclosing. What are the omissions? If they disclosed the fact that there's this other way of looking at this, you don't call it, calling it metrics, that don't include gap principles. Well, just talking about the gap metrics, excuse me, the non-gap metrics for a moment. Now, we do not allege that the gap financials themselves or the non-gap metrics themselves are false and misleading statements. And there's reasons we made a choice to do that approach. The statements are different in the complaint, which I know your honors have read. So one of the statements is that they say that the primary source of cash. Whose day? I'm sorry. Who's intruding the statement? Excuse me. So it was a press release that came out. On an investor day press release? This was not during the investor day. I can get to that. But one of the quarterly press releases that came out from the company, from the Stonewall LP, says that the primary source of cash from which to pay partner distributions was operating cash flow. Excuse the paragraph number in the complaint. 134, your honor. That's page JA103. That's an example. This is one example of a false misleading statement that we allege. Primary source of cash from which to pay partner distributions was operating cash flow. We allege that this was misleading because that's not true. They didn't pay their partner distributions out of operating cash flow. They didn't have very much operating cash flow. Gap operating cash flow was very, very low for two reasons. One, most of their cash, because of the merchandise trust, had to get stuck in the merchandise trust because of industry regulations. Because under the cemetery rules, when you sell a plot or a crypt, you've got to put most of your money away. And also, they were spending most of their money on cemeteries and funeral homes, including the archdiocese cemeteries. So they were spending all that money on that. But they still wanted to enjoy rich quarterly distributions to enrich themselves. So that's why they engaged in what we call in our briefs this cycle of offerings and borrow, which was unsustainable in the long term. It's a Ponzi scheme funded by the. I'm going to use that term, your honor, because that's exactly really what we don't use that term in the complaint. But I think that's a fair way to characterize this. Ultimately, that's exactly right. So that's an example of a false statement. And there's one. Let me ask you specifically about another statement, more to the point, a graphic. It's contained on page set out of page fifty six of the complaint. This one. It is a J.A. one. And I believe part of government 155. This is the conservative financial profile. I think this was a handout or release at an investor day. And you point out and point out correctly that this graphic comparison explicitly shows gap operating profits, which is significant by a significant amount, the lower amount. And then what is termed adjusted operating profit slash accrual. It doesn't it is not designated non gap. What's the significance of that? That's right. So so so this this slide, which we put in our complaint in our view, actually, you know, shows the scheme in many ways for for for the for the court. But they're saying that you alleged a J.A. one ten that analysts, investors knew about this. They are right. So they. So part of their defense is they say everyone could figure this out. It was all out there. Everyone could could figure this out. And here's the thing about that, your honor. So so questions were raised at the beginning of the class period and at near the end of the class period. And in the middle of the class period, you did have some intrepid analysts who said, hold on a second. You don't have enough cash to pay these distributions. Are you going to have to sell equity? And here's what the company said. They said they denied it. They said, no, we would never do that. At one point, a persistent inquiry actually resulted in one of the offices. And I can't remember who essentially bringing the inquiry abruptly to a close. That, too, your honor, that was that was Mr. Miller, the CEO in August of 2012. What I'm trying what I'm trying to get to here is, oh, are you suggesting that what defendants were trying to do was hide the ball? That's exactly what I mean. And so then doesn't this truly come down to whether or not the ball was in fact actually hidden or whether it was out there for any reasonable investor to to see or at least be able that that is right, whether the mix of information with whether whether one could reason whether a reasonable investor could could see what was actually happening or whether one a reasonable investor could not. And when questions were raised at the on the first day of the class period and a couple of months before the last day of the class period. And then in August 2012, as your honor mentioned, a few months into the class period. Every single time a smart investor raised their hand and said, hold on a second, Mr. Corporate officer, the officer shut them down and said we would never do that. We'd never do that. It couldn't be further from the truth. You don't know what you're talking about, Mr. Mr. Analyst. And that was a falsehood that that's a false statement. And shows the invest that and shows the C enter in and of itself under the Avaya case, which talks explicitly about this denial issue. And I would mention the urban outfitters case, which was written by your honor, Judge Restrepo on the on the district court bench, cites Avaya on precisely that issue. And this case is is exactly like Avaya and an urban outfitters on that point. And it's I think this court should follow suit on that question on the question of of a knowing denial in the context of analyst questions. So you have you have content and content. Specifically, were they denying what they were denying? Is whether who did the design short? So on March 15th, 2012, the first day of the class period, you have Mr. Shane, who was the CFO of the company at that time. He was asked by an analyst. In sum and substance, you don't seem to have enough cash to do these distributions. Are you going to have to sell equity to do an equity offering in order to make your distributions? And Mr. Shane says and I don't have I don't have it right in front of me. He says it is our intention to always continue to fund distributions from the business. Thank you, sir. Right. Always continue to fund distributions from the business. Couldn't they argue we disclosed that sometimes we have to borrow money and that's part of our business model. That's included in the 10 case. They borrowing money. Borrowing money for what is the is the is the next question that must be considered. And our position is that they never disclosed that they borrowed money for the purpose of funding distributions. They never connected the dots between borrowing and having to borrow for the purpose of distributions. Relying on borrowing, relying on borrowing for the purpose of distributions. I mean, sure, they borrowed to pay the bills. They borrowed for certain other things. We don't we don't deny that they borrowed every every company's got a revolver. It was a disclosure issue or lack thereof. It's a disclosure issue or lack thereof. And the risk disclosures weren't enough. And one thing that I would ask the court to keep in mind, let's not forget that the value of the units. These are it's not called stocks, called units drop by forty five percent in one day. He's at the end of the class period and that matter. This is a matter of background information. I mean, I am assuming that this is an instrument that the units are instruments that an investor purchases largely for income stream income purposes. This is not like buying a value stock or growth stock. Correct. The entire purpose of the unit, because the limited partnership is to get that cash distribution every quarter, kind of like a dividend that is guaranteed in the sense that, you know, you're going to get something every quarter. The value of the unit does change daily. It's publicly traded, but it doesn't swing wildly. It's not as volatile as as a stock is. The idea is to more get your check. But they're alleging that there's not enough to allege in terms of the drop of the value of the unit. Obviously, they concede. But they're saying that there's no causation that you've alleged. They're saying that we disagree. Lost causation in and of itself. We contend is not before this court because Judge Rebrano did not reach it. He did not reach it. And so this court should not go get into it as a, you know, in the first instance. We think this court's got enough to deal with in this case. But the drop in the unit is still highly relevant on materiality, which is an issue. And this court has what I think is called the clearest commitment to the efficient market theory. And we would suggest that that very, very significant drop on that day in October of 2016 is highly relevant to the effect of these risk disclosures. I mean, if everything you know, the basic defense here is that everything was out there. Enough was out there. You knew everything. There's nothing we didn't disclose. It was all, you know, even if it wasn't all in the same place, you know, the grains of rice were out there. You could have put it all together. You knew enough. If that's really true, then why did the stock crash and it's never come back? Are you asking us to reverse Judge Rebrano or send it back for further consideration? Both reverse your honor on falsity materiality and see enter. Send it back for consideration on loss causation and further proceedings. And I'm sorry, and control person liability, which the judge also didn't reach. There is one, if I may. I know I'm out of time, but it's just one more additional point. Just very quickly, there's a doctrinal issue I want to bring to the court's attention. Mr. Hellman, who is a named defendant, he is not a 10b defendant, but he is a 20a defendant. The reason for that is we did not identify a false statement by him. So he is not a 10b defendant, but he is a control person defendant. We contend that he had see enter and we contend that his see enter. If your honors find that he had see enter should be imputed to the company. And so there is an issue in this case of what is often called corporate center or collective. That's a doctrine that this court has not ruled on one way or another. Exactly right. I would suggest a recent opportunity to do so. Correct. In Kidd Brands and the Horizon case. I would suggest that this case could be a good vehicle to consider it because he is identified in the complaint by name and in detail. He is a defendant in the case, although not 10b. And he is unquestionably high up enough in the corporate structure that he is an authorized agent of the company. And this might be a good vehicle for this court to consider the application. Thank you very much. Good morning, your honors. Michael Holmes, Vincent Elkins for the defendants in this matter. I think under the judge, the lower court's dismissal is entirely appropriate under this court's precedent, not only in Merck, but also in Ierati. When you look at what the crux of the plaintiff's case is, it is that the market did not understand that Stonewall was distributing more than its gap operating profit. And that it had to borrow in order to fund. The market didn't understand it. Is that because the market was misled? No. And that's what I want to get to. Just as a starting point and to see what, if anything, we can all agree on. I go back to references to the averments that were considered literally true. Is the, are the plaintiffs correct that what was done over the class period was in many instances to have an equity offering, use that money to pay down the credit facility. And then in turn to maintain the distributions as had been, if not promised, assured to the unit holders, borrow additional money then from the credit facility to pay the distributions. They're not correct. All right. Let me. That's fundamental, obviously. Yeah, I'm trying. To an understanding of the plaintiff's theory here. Yeah, so. Cognizant of the 15 minutes there. Look, this is the plaintiff stated. This is a unique business, not only because it's an MLP, which is basically a flow through entity that has a quarterly distribution. If there is available cash under the partnership agreement. And in this case, stoneward defines in its public statements, the way it looks at available cash, which not only includes operating results from operations that are gap, but also working capital borrowings. That's how they look at available cash. It's also unique because in the cemetery business, you have at need and pre need sales. And so when you have a pre need sale in a quarter, it is a contract with a customer. But it's for some time, hopefully, you know, well in the future for the for the customer. At least if you're the customer, hopefully. Yeah, at least if you're the customer, hopefully. If. If. You cannot under gap recognize the revenue from the pre need sales contracts until certain. Until a certain time, certain delivery of, you know, if you build a crypt or buy certain materials that are required. The same is, by the way, I don't want to get too much detail. But when you look at the gap, non gap reconciliation, which is in every K and every Q, it seems also true for a portion of at need because you're in the. You may have some. You may have a sale at the end of a quarter, but it's not completed until till the next quarter. So you see a little bit of at need that cannot be immediately recognized at the time, too. But I only get too many details for that because it's primarily the delta between gap and the and the non gap or the adjusting adjusted operating profit. I know your honor asked about. Well, it doesn't say non gap. Every one of the K's and Q's defines the non gap measure is the adjusted operating profit. When you look at the reconciliation. It strikes me that you say in your brief and clearly correct that you don't have to disclose everything in a single document. If you take all the documents together, the disclosures are there and there's no liability. But couldn't there be a situation? And maybe this is what they're alleging that. Yeah, all the disclosures are there, not one document in various documents. But there's so spread around as to suggest basically you tell me which shell the P is under. It's under one of these three. But there's no way for the informed investor to know. And if that's the situation, why wouldn't that be enough to suggest that the emissions that they are alleging are material? Because the disclosures that were made putting all this stuff together are misleading because the way they're made that way, because the way the disclosures are made here and there and help this culture. And, yeah, there are gap principles. Don't pay attention to gap principles. We're not really concerned with those because that doesn't really apply here. Suggesting that the investor really need not be too concerned with some of the numbers that would suggest that you're dipping into the credit facility to make distributions. Two answers. One is looking at what the actual disclosures were. And the second is a legal answer based on the opinions of the circuit. So the first the factual answer from looking at the disclosure, I was struck by the statement that the disclosures were kind of grains of rice spread around. I think that when you look at the disclosures, it's completely unfounded and unfair. Which disclosures? Every single K and every single Q had a gap versus non-gap reconciliation. Every single Q and every single K, and I believe most of the earnings releases say we have to, certainly every Q said we need to borrow between 22 and 49 million, depending on the year. There was a specific number for each year. In order to make our distribution this year, we needed to borrow 22 million from working capital or we needed to borrow 49 million. Every single K says that. Every Q makes clear we look at our business. At our business, there's a lot of statements that we're going to fund from the business. Because of the deferral in the pre-need portion of the portfolio, that's money that belongs to the company that the company is going to get in the future. Belongs or will belong to the company. Will belong. It's in the trust. It cannot belong to the company. That's a fair point. I misspoke. But the company will receive it in the future. And so what the company says, and it's in multiple of the Ks and the Qs, and I can give a record site, is the way it believes the best way to look at the business is through this non-gap adjusted operating profit where it recognizes all sales in the present period and it's going to make distributions on that basis. Mr. Holmes, your clients did more than that, or at least Mr. McGrath did. It seems to me, if the allegations are accurate, these specific allegations I'm about to refer to, that investors and the analyst community were not simply being asked to concentrate on non-gap. Mr. McGrath was dissing the whole use of gap principles, at least as directed by the SEC. I mean, how do you explain, I don't know if the SEC can get any more screwed up. This might be a new level of screwed up. I mean, it looks to me like Mr. McGrath, on behalf of the LP, LLC, is saying, don't look at this, ignore the guy behind the curtain, look at this. Why? Number one. What's the import of that? The import is using non-gap measures is how you think you should look at the business. You need an explanation for that. There are not a lot of businesses that probably use, I've not done a study, but when you're using a non-gap to an investor, you have to tell the investor, well, why are you using non-gap, number one? And there are statements throughout where it says, we use non-gap because we think it's a better measure of our business. But, oh, by the way, here are our gap earnings. Here is our gap operating profit. Mr. McGrath's statement that Your Honor referred to is an opinion statement by Mr. McGrath. It is not every investor. The gap operating profit is plainly disclosed. The graph that plaintiff referred to in the complaint. Mr. McGrath had issued an opinion in response to our question. Somewhere along the lines of, well, in the past, we've run into some cash flow problems and had to dip into our credit facility. That really has not impacted in any way, in my opinion, our ability to make distributions out of current sales. Where have you issued an opinion like that? Because you're suggesting that the fact that it's an opinion on his part is kind of something, it's like maybe a wink and a nod, but a reasonable investor wouldn't put much stock in it. I apologize, Your Honor. I'm not exactly sure of the statement you're referring to. I'm not saying he made the statement. I'm hypothesizing. What if he made a statement like that? So if I understand it, if he made the statement that. . . An opinion. Then an opinion that I don't think we need, we're going to have a problem with distributions? Right. Look, I think the law is pretty clear on opinions that you have to show at the time the person made the opinion, he didn't have a reasonable basis to express the opinion. And so there would have to be facts. . . Look at the history of the borrowing. Would that be undermining a reasonable basis to make the statement? Well, I think under both Merck and Iorati, where, I mean, look, in Iorati in particular, that's a case where the company disclosed we have an FTC investigation about potentially anti-competitive practices. The company, the plaintiffs alleged, well, you didn't disclose that you had exclusive supply agreements. Not only did you not disclose it, you specifically denied it. That was the allegation. You specifically denied it. And the case was dismissed, and this court affirmed on the basis that there was a disclosure in an FTC investigation which should put the investing public on notice that there are potential anti-competitive risks and actions taken by the defendant, despite an express denial. Merck's the same. There was a statement, Merck involved revenue recognition policy, about whether or not a subsidiary of Merck, Medco, that was going to go public, included in its revenues the copayments by people that were getting subscriptions, prescriptions. And it said, no, we're not doing it. And then it came out later and said, okay, well, we are doing it, but we're not going to tell you the amount of it. We're not going to tell you what portion of our revenue it is. A Wall Street Journal article came out and said, well, I'm going to make an assumption that it's a $5 to $10 copay. And so you've got to back $5 to $10 per prescription out of the revenue recognition. Article comes out, stock price drops 35%. District court dismissed. This court affirmed on the basis that Merck had disclosed its revenue recognition. It had disclosed, despite a prior disclosure that it wasn't including copays, had disclosed that it was including copays in that amount, but it didn't disclose how to calculate it. And the court said, look, it required the investing public to make an assumption about what the amount of the copay was and do a simple mathematical exercise. The investing public can do that, as evidenced by the Wall Street Journal article. Here, the disclosures far exceed what was in Merck. Not only did Stonemore disclose repeatedly throughout the class period that it was distributing more money than its GAAP operating profit would allow, but less money than its adjusted operating profit would allow. So it was in between those two, because that's how it looked at its business, adjusted operating profit. But it disclosed why it was doing it, because it believed it was the better way to look at its business, and how it was doing it. It disclosed, we are doing it because we are using working capital borrowings to fund the shortfalls in cash flow, the timing lags created by the pre-need sales. That is in every 10K. And the other thing that's in the 10Ks is a statement on liquidity and capital resources. In this, I'll just cite one example. This is JA359. And it says, our primary short-term liquidity needs are to fund general working capital requirements, repay our debt obligations, service our debt, make routine capital maintenance improvements, and pay distributions. We will need additional liquidity to construct mausoleum and lawn cribs. Our primary sources of liquidity are cash flow from operations and amounts available under our credit facility, as described below. In the past, this is a 2016, in the past, we have been able to increase our liquidity through long-term bank borrowings and the issuance of additional common units and other partnership securities. Stonewall made very clear, this is our business model. We look at it holistically, pre-need, at-need, as if in the present period, and we're making the business decision to distribute to our limited partners distributions based on the entirety of the sales in the present period. What do you make of Mr. Goldsmith's argument with respect to the sharp decline in the stock? Honestly, I don't think that, as we said in the district court, they failed to plead loss causation. What the plaintiffs allege in their complaint. In terms of materiality, then. Well, it's a little different, but what the plaintiffs allege in their complaint is the truth came out in October 2016 because Stonewall announced that it was cutting distributions by 50% because the business had declined. It had sales force issues, and the sales had declined. It didn't say, we're cutting distributions because we don't have working capital borrowings. We're cutting distributions because we can't raise common units. Quite the opposite. As Stonewall always said throughout the class period, its business had declined. The sales had declined, and it couldn't support the distribution that was paid. And what the plaintiff says in the complaint, which they are bound to, they don't allege that's a false and misleading statement. Never. In fact, one of the very first risk factors in the Stonewall 10-K is that a distribution is not guaranteed. As in any business, a distribution depends on the health and the strength of the business. In this quarter, the health and the strength of the business did not support the distribution, and the distribution was cut by 50%. As Your Honor noted, it is true, its background, these are yield-based equities. They trade in relation to the yield on the distribution. Distributions cut 50%, stock price drops about, or unit price, stock price, units and MLP technically, but the unit price drops about 50%. So on that basis, we would say they have failed, not only have they failed to plead loss causation, but they have admitted that there is no loss causation. Let me, again, in search of those items or those issues upon which there may be agreement, do you concede at least that plaintiffs have satisfied the particularity requirements of 9B and the PSLR right here? Well, not to give a longer answer than necessary, but I think that does depend on a, the answer is no across the board, but because it depends on an alleged misrepresentation by alleged misrepresentation basis. A lot of their statements are unattributed in the complaint. They don't say who made them, they don't give. A lot of them are attributed. Some are, but I think on a statement-by-statement basis, I think there are parts of particularity, the who, what, when, where. Part of particularity on some statements may be satisfied on those parts. The why, why is it misleading? I think that they have failed across the board, and I think to address one of your Honor's questions, one of the reasons I think, you know, you can have, in these cases, very long complaints and have sometimes short opinions, sometimes long opinions. The reason why you have a, I think perhaps you have a short opinion here is because, you know, I don't have a very particularly long opinion either, and it's the same reason. It's because the truth was disclosed. Exactly what Stonewall was doing, why it was doing it, and how it was doing it was repeatedly disclosed. So any statement that's made by any of the officers must be viewed in the context of those statements. So I think on a statement-by-statement basis, I'm sure on the who, what, when, and where is satisfied on some. I don't think the why is satisfied on any. Thank you very much. Thank you. Rebuttal, Mr. Goldsmith. Thank you. Thank you, Your Honors. So Mr. Holmes said quite a few things, but I'll try to be brief. The, first of all, just about the unattributed statements. We have a footnote, footnote number nine, page 22 of our reply brief where I think we deal with that issue in some detail. I won't belabor it. Most of the statements are attributed. There are statements that are attributed to Stonewall. There's no reason why a company can't be a speaker. There's a lot of cases that seem to assume that a company can't be a speaker. Why not? A company can be sued. A company can speak. I see no reason why a company can't be a speaker here. The sales force issue. Sales force issues are a fig leaf, we contend. We've said this. It's something that's made up. I mean, what we've said is that the reason why this entire thing came to a head is because they had the risk statement. They lost their access to the capital markets. The reason they lost their access to the capital markets, because you have to have 14 months of gap compliant audited financial statements. If you don't have that, then you're done. You can't do any offerings. They couldn't do any offerings, and everything collapsed like a house of cards. That's the reason. But they couldn't admit the real reason, so they called it sales force issues. That's the excuse they used in their press release. And we've got stuff in our brief that explains why that should be accepted as, why our version should be accepted as at least as plausible as Stonewall's reason. And under Iqbal, that's the version that we contend has to be accepted here. In terms of the Sienta issues, you know, it's, one thing that's really important that I'd ask this court to consider is that under Telabs, which we discussed briefly, Justice Ginsburg handed the defendants in every case a golden opportunity to tell their own story. So Justice Ginsburg made clear that the courts are obligated to consider proffered, plausible, non-culpable inferences. And you have to weigh the plaintiff wins a tie, but you have to consider what the defendants say. This, in this case, for the first time in my personal experience, and these kinds of cases are basically all I do since Telabs, the defendants have proffered nothing. They were given an opportunity below and here to offer a non-culpable inference to tell their story of what happened here, to tell their story of why the inferences should cut their way, and they haven't done so. They haven't said a word. They've been entirely silent. Silent in their briefs, silent before Judge Robreno, and to my memory, silent just now. And that's not dispositive. The pleading burden remains ours. But I think that is quite telling. And I think this court should take that to heart. Thank you very much. Thank you, sir. Thank you very much, counsel, for your helpful arguments and your very skilled and helpful briefs as well. We'll take this case, my introduction to the death care services industry under advisement. Thank you very much.